## 24-4251(L), 24-4252, 24-4273

# United States Court of Appeals
### *for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

JAIRO GUSTAVO AGUILERA SAGASTIZADO,
a/k/a Coy, a/k/a Psiclogo, MELVIN CANALES SALDANA, a/k/a
Carlos Vigil Garay, a/k/a Carlos Bladimir, a/k/a Demente,
MANILESTER ANDRADE RIVAS, a/k/a Mani,
a/k/a Tandori, a/k/a Conejo, a/k/a Coqueto,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## BRIEF OF APPELLANT

Joseph D. King
KING CAMPBELL
PORETZ & THOMAS, PLLC
118 North Alfred Street
Alexandria, Virginia 22314
(703) 683-7070
*Counsel for Appellant Sagastizado*

Lana Manitta
LAW OFFICE OF LANA MANITTA, PLLC
1800 Diagonal Road, Suite 600
PMB 1152
Alexandria, Virginia 22314
(703) 705-4428
*Counsel for Appellant Saldana*

Mark Bodner
ATTORNEY AT LAW
4041 University Drive, Suite 403
Fairfax, Virginia 22030
(703) 385-6667
*Counsel for Appellant Rivas*

CP COUNSEL PRESS     (800) 4-APPEAL • (JOB 811168)

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................

STATEMENT OF JURISDICTION` ........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE ..................................................................3

    A.    Background ........................................................................3

    B.    Pretrial Matters .................................................................4

    C.    Trial and the Verdicts ......................................................4

    D.    Post-Trial Motions ...........................................................5

    E.    Sentencing .......................................................................6

        i.    Aguilera............................................................6

        ii.    Canales .............................................................6

        iii.    Andrade ............................................................7

STATEMENT OF FACTS ........................................................................7

SUMMARY OF ARGUMENT ..................................................................9

    ISSUE I..............................................................................9

    ISSUE II.............................................................................9

    ISSUE III ...........................................................................9

    ISSUE IV...........................................................................10

    ISSUE V............................................................................10

    ISSUE VI...........................................................................11

ARGUMENT ..........................................................................................11

I.     THE DISTRICT COURT ERRED IN DENYING AGUILERA'S MOTION FOR A MISTRIAL AFTER THE DISTRICT COURT STRUCK THE TESTIMONY OF A CRITICAL COOPERATING WITNESS DUE TO CREDIBILITY AND BRADY ISSUES AFTER THE WITNESS DELIVERED HIGHLY INCULPATORY TESTIMONY AGAINST AGUILERA; THE DISTRICT COURT LIKEWISE ERRED IN DENYING AGUILERA'S MOTION FOR A NEW TRIAL BASED ON THE STRIKING OF THIS WITNESS .......................................................11

    A.    Statement of Additional Facts....................................11

    B.    Standard of Review....................................................14

    C.    Argument ...................................................................15

II.    THE DISTRICT COURT ERRED IN DENYING CANALES' MOTION FOR ACQUITTAL, OR ALTERNATIVELY FOR A NEW TRIAL, AFTER THE STRIKING OF THE TESTIMONY OF A CRITICAL COOPERATING WITNESS PROVED HIGHLY PREJUDICIAL, AND INSTEAD A MISTRIAL SHOULD HAVE BEEN DECLARED ...............................................18

    A.    Standard of Review....................................................18

    B.    Argument ...................................................................19

        i.    Striking Molina's Testimony in its Entirety and Calling Him Not Credible Removed From the Defense Key Exculpatory Evidence and Prevented the Defense from Challenging Unreliable Uncorroborated Inculpatory Testimony, Without Erasing the Taint of Molina's Testimony.........................................20

        ii.    The Reason Given for Striking Molina's Testimony Was Not Accurate.......................................22

        iii.    Striking Molina's Testimony Based on a Finding he was "Not Credible" Bolstered the Credibility of Other Witnesses, Gravely Prejudicing Canales .......................................23

ii

iv.    The Prejudice to Canales is Evident in the Jury's Irreconcilable Verdict .......................................................24

v.     The Ends of Justice Require Acquittal Despite the Lack of Contemporaneous Objection to the Court's Decision to Strike Molina and the Instruction to the Jury .......................................................26

III.    THE DISTRICT COURT ERRONEOUSLY INSTRUCTED THE JURY PERMITTING IT TO DETERMINE THAT APPELLANT MANILESTER ANDRADE RIVAS CONSPIRED TO MURDER E.L.T. UPON EVIDENCE OF SECOND DEGREE MURDER ...........................................................27

A.    Standard of Review....................................................................27

B.    Argument .....................................................................................27

i.    The Error Was Not Harmless .........................................29

IV.    THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT THE EVIDENCE SUPPORTED THE JURY'S VERDICT AGAINST CANALES ON COUNTS 9 AND 10, AND THE SPECIAL FINDING AS TO COUNT 1, WHERE THE GOVERNMENT PRESENTED NO EVIDENCE THAT CANALES CONSPIRED WITH OR AIDED OR ABETTED OTHERS WITH SPECIFIC INTENT TO MURDER E.L.T. .............................31

A.    Standard of Review....................................................................31

B.    Argument .....................................................................................32

i.    Conspiracy to Commit Murder in Aid of Racketeering Requires Intent to Kill Victim .................32

ii.     Aiding and Abetting Requires Specific Intent that the Charged Offense Be Committed Prior to or During its Commission................................................34

iii.    Aiding and Abetting Requires Commission of the Substantive Offense .................................................38

iii

V.   THE DISTRICT COURT ERRED IN ITS
     DETERMINATION THAT EVIDENCE SUPPORTED
     THE JURY'S VERDICT THAT ANDRADE CONSPIRED
     TO MURDER E.L.T. WHERE THE GOVERNMENT
     PRESENTED NO EVIDENCE THAT ANDRADE
     CONSPIRED WITH SPECIFIC INTENT
     TO MURDER E.L.T ...................................................................39

     A.   Standard of Review..................................................39

     B.   Argument ..................................................................39

VI.  THE DISTRICT COURT ERRED IN DENYING
     CANALES' MOTION TO SUPPRESS.............................................40

     A.   Statement of Additional Facts..................................40

     B.   Standard of Review..................................................44

     C.   Argument ..................................................................43

CONCLUSION ......................................................................................53

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Arizona v. Gant,*
   556 U.S. 332 (2009)............................................................................44

*Burns v. United States,*
   235 A.3d 758 (D.C. 2020) .....................................................46, 48, 49

*Chapman v. California,*
   386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)............................29

*Commonwealth v. Abdo,*
   64 Va. App. 468, 769 S.E.2d 677 (2015) ......................................27, 40

*Coolidge v. New Hampshire,*
   403 U.S. 443 (1971)......................................................................47, 52

*Fortune v. Commonwealth,*
   12 Va. App.643, 406 S.E.2d 47 (1991) ...............................................40

*In re Search of Black iPhone 4,*
   27 F.Supp.3d 74 (D.D.C. 2014)...........................................................51

*Kentucky v. King,*
   563 U.S. 452 (2011)..............................................................................44

*Laird v. Horn,*
   414 F.3d 419 (3rd Cir. 2005) .........................................................29, 31

*Maestas v. United States,*
   341 F.2d 493 (10th Cir. 1965) .................................................15, 16, 17

*Marron v. United States,*
   275 U.S. 192 (1927)......................................................................44, 48

*Maryland v. Garrison,*
   489 U.S. 79 (1987)................................................................................52

*Mitchell v. State,*
   767 A.2d 844, 363 Md. 130 (2001) ...............................................29, 41

*Nye & Nissen v. United States,*
   336 U.S. 613, 93 L. Ed. 919, 69 S. Ct. 766 (1949)............................34

*People v. Hammond*,
  187 Mich.App. 105, 466 N.W.2d 335 (Mich. App. 1991) ......................29, 41, 42

*Rhodes v. Commonwealth*,
  238 Va. 480, 384 S.E.2d 95 (1989) ....................................................................28

*Riley v. California*,
  573 U.S. 373, 134 S.Ct. 2473 (2014).............................................................45, 46

*Rosemond v. United States*,
  572 U.S. 65, 188 L.Ed.2d 248, 134 S. Ct. 1240 (2014) ...................................35

*Stanford v. Texas*,
  379 U.S. 476 (1965)......................................................................................44, 48

*United State v. Uzenski*,
  434 F.3d 690 (4th Cir. 2006) ............................................................................43

*United States v. Alerre*,
  430 F.3d 681 (4th Cir. 2005),
  *cert. denied*, 547 U.S. 1113, 164 L. Ed. 2d 687,
  126 S. Ct. 1925 (2006)........................................................................................18

*United States v. Barnett*,
  660 Fed. App'x. 235 (4th Cir. 2016) ......................................................32, 33, 41

*United States v. Beck*,
  615 F2d 441 (7th Cir. 1980) ..............................................................................34

*United States v. Brewer*,
  1 F.3d 1430 (4th Cir. 1993) ...............................................................................14

*United States v. Burgos*,
  94 F.3d 849 (4th Cir. 1996) ...............................................................................35

*United States v. Davis*,
  75 F.4th 428 (4th Cir. 2023) ..............................................................................31

*United States v. Di Stefano*,
  555 F2d 1094 (2d Cir. 1977) .............................................................................34

*United States v. Draven*,
  77 F.4th 307 (4th Cir. 2023) ..............................................................................35

*United States v. Edwards*,
  188 F.3d 230 (4th Cir. 1999) .............................................................................32

vi

*United States v. Garcia*,
   855 F.3d 615 (4th Cir. 2017) ............................................................... 18

*United States v. Griffith*,
   867 F.3d 1265 (D.C. Cir. 2017) .......................................................... 44

*United States v. Habegger*,
   370 F.3d 441 (4th Cir. 2004) ............................................................... 31

*United States v. Jackson*,
   32 F.4th 278 (4th Cir. 2022) ............................................................... 35

*United States v. Jones*,
   132 S. Ct. 945 (2012) ........................................................................... 46

*United States v. Kingrea*,
   573 F.3d 186 (4th Cir. 2009) ............................................................... 39

*United States v. Kirschenblatt*,
   16 F.2d 202 (2d Cir. 1926) ................................................................... 46

*United States v. Leon*,
   468 U.S. 897 (1984) ............................................................................. 44

*United States v. Love*,
   767 F.2d 1052 (4th Cir. 1985) ............................................................. 35

*United States v. Orrico*,
   599 F.2d 113 (6th Cir. 1979) ............................................................... 31

*United States v. Ortiz-Orellana*,
   90 F.4th 689 (4th Cir. 2024) ............................................................... 34

*United States v. Parker*,
   790 F.3d 550 (4th Cir. 2015) ............................................................... 18

*United States v. Pearlstein*,
   576 F2d 531 (3d Cir. 1978) ................................................................. 34

*United States v. Perry*,
   335 F.3d 316 (4th Cir. 2003) ............................................................... 31

*United States v. Ravenell*,
   66 F.4th 472 (4th Cir. 2023) ............................................................... 27

*United States v. Roof*,
   10 F.4th 314 (4th Cir. 2021) ............................................................... 14

*United States v. Samad*,
754 F.2d 1091 (4th Cir. 1984) ...........................................................31

*United States v. Seeright*,
978 F.2d 842 (4th Cir. 1992) .............................................................24

*United States v. Simmons*,
11 F.4th 239 (4th Cir. 2021) ..............................................................36

*United States v. Smith*,
451 F.3d 209 (4th Cir. 2006) .............................................................32

*United States v. Thomas*,
58 F. App'x 952 (4th Cir. 2003) .........................................................35

*United States v. Tipton*,
95 F.4th 831 (4th Cir. 2024) ..............................................................34

*United States v. Weil*,
561 F.2d 1109 (4th Cir. 1977) ...........................................................35

*United States v. Wilson*,
484 F.3d 267 (4th Cir. 2007) .............................................................43

*United States v. Winn*,
79 F. Supp. 3rd 904 (S.D. Ill. 2015) ...................................47, 49, 50, 51

*United States v. Winstead*,
708 F.2d 925 (4th Cir. 1983) .............................................................34

*United States v. Wolf*,
860 F.3d 175 (4th Cir. 2017) .............................................................14

*Yates v. United States*,
354 U.S. 298, 77 S. Ct. 1064 .............................................................37

## Statutes & Other Authorities:

U.S. Const. amend. IV ........................................................................44

18 U.S.C. § 1959(a)(5)........................................................................27

18 U.S.C. § 1959(b)(2)........................................................................34

18 U.S.C. § 3231 ..................................................................................1

28 U.S.C. § 1291 ...............................................................................1, 3

FRCP 5(f) ..................................................................................26

FRCP 29 ................................................................5, 8, 26, 31

FRCP 33 ...........................................................................26, 31

FRCP 33(a) ............................................................................15

Va. Code § 18.2-22 ........................................................27, 40

Va. Code § 18.2-32 ...........................................27, 28, 30, 40

## STATEMENT OF JURISDICTION

This appeal arises from the criminal convictions of Appellants Jairo Gustavo Aguilera Sagastizado ("Aguilera"), Melvin Canales Saldana ("Canales"), and Manilester Anrade Rivas ("Andrade" or "Mani") on charges returned in a twenty-count Second Superseding Indictment. Joint Appendix ("JA") 90. The cases were tried by a jury in the Eastern District of Virginia, Alexandria Division, the Honorable Leonie M. Brinkema presiding. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

The Orders of Conviction for each of the Appellants were entered on April 20, 2024. JA1822-1842. Canales filed his Notice of Appeal on May 4, 2024. JA1843. Aguilera filed his on May 5, 2024. JA1845. Andrade filed his on May 10, 2024. JA1847.

This Honorable Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

1

# STATEMENT OF THE ISSUES

I.     **THE DISTRICT COURT ERRED IN DENYING AGUILERA'S MOTION FOR A MISTRIAL AFTER THE DISTRICT COURT STRUCK THE TESTIMONY OF A CRITICAL COOPERATING WITNESS DUE TO CREDIBILITY AND BRADY ISSUES AFTER THE WITNESS DELIVERED HIGHLY INCULPATORY TESTIMONY AGAINST AGUILERA; THE DISTRICT COURT LIKEWISE ERRED IN DENYING AGUILERA'S MOTION FOR A NEW TRIAL BASED ON THE STRIKING OF THIS WITNESS.**

II.    **THE DISTRICT COURT ERRED IN DENYING CANALES' MOTION FOR ACQUITTAL, OR ALTERNATIVELY FOR A NEW TRIAL, AFTER THE STRIKING OF THE TESTIMONY OF A CRITICAL COOPERATING WITNESS PROVED HIGHLY PREJUDICIAL, AND INSTEAD A MISTRIAL SHOULD HAVE BEEN DECLARED.**

III.   **THE DISTRICT COURT ERRONEOUSLY INSTRUCTED THE JURY PERMITTING IT TO DETERMINE THAT APPELLANT MANILESTER ANDRADE RIVAS CONSPIRED TO MURDER E.L.T. UPON EVIDENCE OF SECOND DEGREE MURDER.**

IV.    **THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT THE EVIDENCE SUPPORTED THE JURY'S VERDICT AGAINST CANALES ON COUNTS 9 AND 10, AND THE SPECIAL FINDING AS TO COUNT 1, WHERE THE GOVERNMENT PRESENTED NO EVIDENCE THAT CANALES CONSPIRED WITH OR AIDED OR ABETTED OTHERS WITH SPECIFIC INTENT TO MURDER E.L.T.**

V.     **THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT EVIDENCE SUPPORTED THE JURY'S VERDICT THAT ANDRADE CONSPIRED TO MURDER E.L.T. WHERE THE GOVERNMENT PRESENTED NO EVIDENCE THAT ANDRADE CONSPIRED WITH SPECIFIC INTENT TO MURDER E.L.T.**

VI.    **THE DISTRICT COURT ERRED IN DENYING CANALES' MOTION TO SUPPRESS.**

## STATEMENT OF THE CASE

A.     Background

The indictment in this case alleged the defendants engaged in a RICO

conspiracy as members of the Sitios Locos Salvatrucha ("STLS" or "clique") of the

street gang known as La Mara Salvatrucha, or "MS-13." JA94. The indictment

further alleged that clique members, including Appellants, co-defendants, and

numerous cooperating witnesses, engaged in acts of violence including murder

against "chavalas" or rivals. JA92-93. In addition to the racketeering conspiracy,

Canales was accused of ordering co-defendants to commit murders of rivals in May

of 2019, and was therefore charged with conspiracy to commit murder in aid of

racketeering as well as murder and a firearm offense in relation to the shooting

death of E.L.T in August 2019. *See* JA90 *et seq.* Andrade was charged with the

same conspiracies, murder, and firearm offense as Canales. *Id.* Aguilera was

accused of the racketeering conspiracy, along with conspiracy to murder, murder,

and a firearm offense in relation to the shooting death of A.K.S. in September

2019. *Id.* Each of the Appellants was also charged with conspiracy to distribute

cocaine, and Canales and Andrade were accused of substantive counts of cocaine

distribution. JA113, JA129-131, JA134.

3

B.     Pretrial Matters

Prior to the trial, Canales moved for the suppression of evidence seized
pursuant to warrants to search his cell phones, iCloud, and vehicle on the grounds
that the warrants were overbroad. JA135-148. This motion was denied. JA165.

C.     Trial and the Verdicts

A jury trial was conducted between January 8 and January 18, 2024, during
which it came to light that exculpatory evidence—specifically impeachment
evidence related to cooperating government witness Abner Molina aka "Tecolote"
or "Teco" ("Teco") had been withheld. JA1501-1502. The trial court first
considered declaring a mistrial, but on the suggestion of Andrade's counsel—with
which Canales' counsel agreed at the time, Molina's testimony was stricken
instead. JA1502. Aguilera asked the court to grant a mistrial, which was denied.
JA1504. Counsel was asked to offer their position in the midst of the trial without
time to reflect upon or review the record, including most importantly the testimony
of Teco itself. JA1499. As a consequence, while some unfavorable testimony was
excluded, so too was testimony favorable to Canales, as well as the effective
challenge that each Appellant was prepared to make to Teco's testimony based on
other corroborating and conflicting evidence and testimony.

The district court in its instructions to the jury detailed the elements of first
and second degree murder concerning Court Nine charging Andrade and the others
with conspiracy to murder E.L.T.  (JA1665; JA1670-1673)

4

Aguilera was convicted of Count 1, Racketeering Conspiracy, with a special finding that as part of the conspiracy he committed the murder of A.K.S. JA1743. He was also convicted of Count 2, Conspiracy to Distribute Cocaine (500g or more), Count 12, Conspiracy to Murder A.K.S., Count 13, Murder of A.K.S. in Aid of Racketeering, and Count 14, Use of a Firearm in the Murder of A.K.S. JA1744-1745.

Canales was also convicted of Counts 1 and 2, as well as Count 9, Conspiracy to Murder E.L.T., Count 10, Murder of E.L.T. in Aid of Racketeering, and Counts 16 and 17, Distribution of Cocaine. JA1746-1748. Canales was acquitted of the firearm offense. JA1748.

Andrade was convicted of Counts 1, 2, and 9, along with two substantive counts of distribution of cocaine. JA1749-1751. He was acquitted of the murder of E.L.T. and the firearm charge. JA1750-1751.

D.    Post-Trial Motions

Each of the Appellants challenged their convictions with post-trial motions pursuant to Federal Rules of Criminal Procedure ("FRCP") 29, or alternatively 33. Canales pressed the Court on his and Andrade's position that one cannot conspire or plan in advance (in this case months in advance), with the specific intent to kill an unknown person.  Canales suggested that based on the Government's theory maintained throughout the trial, this constituted a variance from the indictment.

5

JA1781-1784. The Government responded, and the district court agreed that the co-conspirators were out hunting for rivals, had weapons planned for in advance, and were responsible for the killing. JA1792-1793;  JA1796.

Immediately before the district court's ruling on the post-trial motions Andrade's counsel stressed that his statements to law enforcement showed that the defendants were reacting to E.L.T.'s shooting attack, to wit: that he (Andrade) told co-defendant "Serio" on his approach to the stranger E.L.T., "don't do it."  This evidenced Andrade's complete absence of specific intent to conspire to murder E.L.T.  JA1799-1801.

E.     Sentencing

Upon consideration of the presentence investigation reports, evidence presented and argument of counsel, the district court imposed the following sentences:

*i.     Aguilera*

The district court imposed life sentences on counts 1 and 13 and 10 years on counts 2 and 12, to be served concurrently. JA1837

*ii.     Canales*

The district court imposed life sentences on counts 1 and 10, 20 years on count 2, 10 years on count 9, and five years on counts 16 and 17, to be served concurrently. JA1830.

6

    *iii.*    *Andrade*

The district court imposed 168 months on counts 1 and 2, 10 years on count 9, and five years on counts 19 and 20, to run concurrently. JA1823.

## STATEMENT OF FACTS

Appellants were members of the STLS clique of MS-13. JA900. The "first word," i.e., the leader of the clique, was Marvin Menjivar Gutierrez, aka "Astuto." JA869. At the behest of Astuto, the clique members engaged in the sale of cocaine and marijuana, attended regular meetings, paid dues, and generally pledged an allegiance to the gang. JA697, JA857, JA906, JA912. As a means to show one's allegiance, as well as to gain promotion to higher ranks within the clique, members were expected to protect the reputation and "turf" of the clique at all times. JA738.

In the Summer of 2019, four men were killed in Woodbridge, Virginia, and investigation into their shootings established that they were linked to the STLS clique of MS-13. JA630-631. E.L.T. and A.K.S. were two of these men. JA631. Neither man was previously known to STLS or any of its members, including any of the Appellants or other participants in the shootings. JA1296.

What's App messages discovered on Canales' phone—both text and audio—established that in the Spring of 2019, the "higher-ups" of MS-13 in El Salvador were growing frustrated with the clique's lack of activity and failure to promote members to higher ranks. JA721-722. Promotion was to be obtained by the killing

7

of rival gang members, known as "chavalas." JA867. MS-13's biggest and most

prolific rivals are two other gangs, 18th Street and Surenos. *Id*.

In May 2019, Canales and clique leader Astuto conveyed the message from the

leaders in El Salvador to the clique members that more was expected of them, and

soon. JA721-722. They were to find and kill chavalas. JA721, JA1278.

There is, however, a protocol in place to avoid killing the wrong people and

to attempt to avoid detection by police. JA442. This protocol, which is as much a

part of the rules of MS-13 as is the killing of chavalas, dictates that first, one must

identify a suspected chavala by some indication of rival affiliation (gang signs,

wearing "colors," social media, or explicit claims of membership with a rival). *Id*.

Next, there must be an investigation conducted to confirm that the individual is, in

fact, a rival gang member. *Id*. Canales gave an explicit instruction that such things

"must be done right." JA1913.

The shootings of E.L.T. and A.K.S. were in fact not approved in advance, as

there was no prior identification of either man as being a rival gang member, or any

investigation done in that regard. They were both "spur of the moment" unilateral

decisions by members other than Appellants and in the case of E.L.T., in response

to E.L.T. 's firing on the clique members first. *See* JA1463, JA2188.

## SUMMARY OF ARGUMENT

ISSUE I:

The United States failure to timely disclose "potentially inconsistent information about a key government witness" resulted in the district court striking a critical cooperating witness who had told the jury that Aguilera had murdered A.K.S. The district court's "first thought" was to declare a mistrial and Aguilera moved for the same. The district court's denial of Aguilera's motion for a mistrial (and after his conviction for murder-in-aid of racketeering of A.K.S. and other charges, Aguilera's motion for a new trial) was an abuse of discretion.

ISSUE II:

Because the striking of Molina's testimony had an imbalanced and highly prejudicial effect on Canales' defense, and a mistrial would have been the appropriate remedy for the *Brady* violation, Canales' post-trial motion for acquittal, or alternatively a new trial, should have been granted.

ISSUE III:

The district court erred in instructing the jury on Counts One and Nine of the second superseding indictment charging Mani with conspiracy to murder E.L.T. in aid of racketeering. The court's instructions specifically defined murder under Virginia law, in part to include the elements of second-degree murder. Virginia law defines second degree murder as excluding proof of premeditation or planning.

9

The offense of conspiracy to commit second degree murder does not exist.

Conspiracy requires specific intent. The district court erred in its instructions that

allowed the jury to find Mani guilty of conspiracy to commit second degree murder

of E.L.T.

This error was not harmless.

ISSUE IV:

Because Canales lacked any intent whatsoever to kill E.L.T., who was

unknown to him and as to whom there was no evidence of rivalry with MS-13, no

reasonable jury could find sufficient evidence of his conspiring to murder or aiding

and abetting the murder of E.L.T. Furthermore, the jury's verdicts indicate the

killing of E.L.T. was not murder, but self-defense.

ISSUE V:

The district court erred in concluding the Government presented sufficient

evidence to prove Mani had the specific intent to murder E.L.T. in aid of

racketeering. The Government presented evidence to show Mani went on patrol

with other MS-13 members, to enhance his status with the clique, that is to hunt for

a possible gang rival to kill. But the Government produced no evidence to

establish that Mani knew of or about E.L.T., who he was, or that he could even see

in the darkness to identify him as a potential rival, much less that he (Mani) had

specific intent to conspire to commit murder of E.L.T.

10

ISSUE VI:

The search warrants for Canales' phones and iCloud accounts were so

lacking in particularity, they were effectively general warrants which are prohibited

by the Fourth Amendment as overbroad.

## **ARGUMENT**

**I.   THE DISTRICT COURT ERRED IN DENYING AGUILERA'S
MOTION FOR A MISTRIAL AFTER THE DISTRICT COURT
STRUCK THE TESTIMONY OF A CRITICAL COOPERATING
WITNESS DUE TO CREDIBILITY AND BRADY ISSUES AFTER
THE WITNESS DELIVERED HIGHLY INCULPATORY
TESTIMONY AGAINST AGUILERA; THE DISTRICT COURT
LIKEWISE ERRED IN DENYING AGUILERA'S MOTION FOR A
NEW TRIAL BASED ON THE STRIKING OF THIS WITNESS.**

A.    Statement of Additional Facts

Appellants' jury trial commenced in the district court on January 8, 2024. On

Friday, January 12, 2024, the fifth day of trial, the government called Abner

Molina Rodriguez, also known as Rino and Tecolote. Molina was a key witness

against Defendant-Appellant Aguilera, who Molina referred to as Coy. Molina

testified that he and Aguilera discussed purchasing a gun for the clique that was

being offered to Aguilera. JA1274-1275. He testified that Aguilera came down

from New York to Virginia with drugs and a gun on the night that A.K.S. was

killed. JA1311. Molina testified extensively regarding the night of A.K.S.'s

murder, and told the jury that Aguilera, Molina, and Mario Antonio Guevara (AKA

"Blue") went looking for a victim that night. He ultimately told the jury that

11

Aguilera and Guevera or "Blue," another cooperating witness, shot A.K.S. to death. JA1313-1323.

Molina delivered testimony on behalf of the government for almost an entire day: from 9:40 am in the morning until 5:03 pm that same evening. JA1259 & JA1423. Molina was the government's final cooperating witness and the final eyewitness who told the jury that Aguilera participated in the murder of A.K.S.. While other evidence at trial, including Guevara's ("Blue's") testimony,[1] provided evidence against Aguilera that he had participated in the murder of A.K.S., Aguilera submits the Molina not only told the jury that Aguilera shot A.K.S. multiple times, but fully corroborated Guevara's testimony (a man who admitted committing three murders and had every reason to implicate others to obtain consideration from the government) even on the point that Molina was present at the A.K.S. murder, but did not shoot A.K.S. because by the time the gun was handed to Molina it had run out of bullets. Compare JA1318 (Molina's testimony) with JA806-807 (Guevera's testimony).[2] In sum, Molina was a devastating witness against Aguilera and despite the district court's instruction that his testimony not be considered by the jury, Aguilera argues that it defies reason that the jury could truly

---

[1] See JA799-823 (Guevera's testimony).

[2] Molina, who pleaded guilty to the murders of E.L.T. and A.K.S., claimed that he did not shoot either decedent. During the E.L.T. murder, he testified that he threw his one bullet into the woods.

12

disregard what it had heard.

The weight of Molina's testimony was also increased because he finished testifying on a Friday evening and the jury had the opportunity to process it over a holiday weekend–there were no court proceedings the following Monday, January 15, 2024, due to a federal holiday. Due to inclement weather, there were also no court proceedings on Tuesday, January 16, 2024, and the jury still had no inkling Molina's almost entire day of testimony was improper. On that date, however, co-defendant Cristian Ariel Arevalo Arias[3] filed a sealed *Motion for Specific Relief to Enforce Brady Order*. ECF 815 (referencing a *Motion to Seal* that pleading).

On Wednesday, January 17, 2024, the Court noted that Arevalo's *Motion for Specific Relief* had been adopted by the defendants in the first trial, including Aguilera, who also joined the motion on the record. JA1492 & JA1499. Arevalo's motion referenced the failure of the prosecution to disclose *Brady* and *Jencks* material with respect to Abner Molina. As a consequence of the government's failure to timely disclose "potentially inconsistent information about a key government witness," the district court "gave serious thought" to declaring a mistrial. JA1501 & JA1502. A co-defendant suggested the remedy of striking Molina's testimony, JA1499, and the court stated it was going to follow that

[3] On December 15, 2023, Mr. Arevalo's trial, along with two other co-defendants, had been severed from Mr. Aguilera's trial. Arevalo's trial was scheduled to start after Aguilera's trial. *See* ECF 713.

recommendation. JA1502. The district court again emphasized that declaring a

mistrial "would have been my first thought." JA1503. In line with the district

court's instinct, counsel for Aguilera moved for a mistrial, which the district court

denied. JA1504. Prior to closing arguments, the district court stated: "This should

never have happened. And as I said, the case is teetering like this. I'm still

concerned as to whether I should have declared a mistrial." JA1546

     After the close of all the evidence on January 17, 2024, the district court

instructed the jury, in part, as follows: "I have determined, based upon information

brought to my attention, that the testimony of Mr. Molina and any exhibits that he

was used to introduce are to be stricken from the record. So as you think about this

case, you must disregard any evidence presented through Mr. Molina, whom I have

found not to be a credible witness." JA1545. On January 18, 2024, the jury found

Aguilera guilty on all counts for which he was charged under the Second

Superseding Indictment. JA1732; *see also* Verdict Form, JA1743-1745.

B.    Standard of Review

     The district court's denial of a motion for a mistrial is reviewed for abuse of

discretion. *United States v. Roof*, 10 F.4th 314, 375 (4th Cir. 2021) (citing *United

States v. Brewer*, 1 F.3d 1430, 1437 (4th Cir. 1993). Likewise, a district court's

denial of motion for a new trial is reviewed under the same standard. *United States

v. Wolf*, 860 F.3d 175, 189 (4th Cir. 2017)("This court reviews 'the district court's

14

denial of a motion for a new trial under an abuse of discretion standard' of

review.").

C.     Argument

Defendant-Appellant Aguilera maintains that the district court erred in

denying Aguilera's motion for a mistrial and his motion under Federal Rule of

Criminal Procedure 33(a) for a new trial because "the interest of justice so

require[d]." Specifically, while Molina's testimony had been struck and a curative

instruction given, the jury heard (and was able to dwell on the same for days) a

witness that claimed Aguilera was instrumental and participated in A.K.S.'s

murder—which same testimony corroborated other government testimony.

Applying common sense principles, Aguilera disputes that anything short of

mistrial could have cured the taint against him that was caused by Molina. Molina

was on the stand for nearly a day, the jurors were released after his testimony under

the mistaken belief that it should be considered, and only more than four days later

were told not to consider it. A mistrial should have been declared, and if not, a new

trial should have been granted.

The Tenth Circuit correctly stated that "where the character of the testimony

is such that it will create so strong an impression on the minds of the jurors that

they will be unable to disregard it in their consideration of the case, although

admonished to do so, a mistrial should be ordered." *See Maestas v. United States,*

15

341 F.2d 493, 496 (10th Cir. 1965). In *Maestas,* the court reversed convictions

where the trial judge struck a government informant's two answers regarding the

defendant's prior confinement in a penitentiary and gave curative instructions to

disregard the answers. *Id.* The appellate court found that such testimony "could not

help but have had a strong prejudicial effect on the jury" and, therefore, a mistrial

should have been granted. *Id.* In the instant case, Abner Molina's testimony was far

more prejudicial where he told the jury that Aguilera shot the decedent multiple

times, which corroborated Guevara, who admitted to committing three murders,

that Aguilera participated in A.K.S.'s murder even to the degree that the gun had

run out of bullets when handed to Molina to also shoot the decedent. The district

court erred in denying Aguilera's motion for a mistrial and his motion for a new

trial.

Molina was a critical prosecution witness. He was the government's last

major witness and his testimony took almost a full day, during which numerous

government exhibits were entered into evidence. He gave highly incriminating

testimony regarding Aguilera's alleged involvement in MS-13 and the murder of

A.K.S. JA1275, JA1311, JA1313-1323. In *Maestas*, the court found reversible

error where the prejudice arose from the answers to two questions, answers that

were immediately struck. *Maestas,* 341 F.2d at 496. In the instant case, the highly

prejudicial testimony spanned over six hours and it was not struck until nearly five

16

days later. Molina testified on January 12, 2024. Due to the weekend, federal

holiday, and winter weather, the jury was not instructed to disregard his testimony

until January 17, 2024. Thus, for more than four full days, the jurors had this

extensive testimony in mind when considering the case. It was, save for brief

testimony by a cellular mapping expert, the very last prosecution evidence they saw

and heard before going home and not returning until almost five days later.

Moreover, due to the high volume of exhibits and the need to remove the exhibits

introduced through Molina, the jury was not given the exhibits and an amended list

of exhibits until the following day, January 18, 2024. *See* JA1722-1723. That was

another day in which the jury went home with all the evidence in mind and not

knowing which exhibits had been struck. The prejudicial impact was significant,

far greater than in a case where the testimony is limited to two answers, is

immediately struck, and the jury immediately instructed to disregard it. *See*

*Maestas,* 341 F.2d at 496.

In addition, the reason given by the district court for striking Molina's

testimony confused the jury and caused further error. The court instructed the jury:

"[Y]ou must disregard any evidence presented through Mr. Molina, whom I have

found not to be a credible witness." JA1545. In fact, however, the testimony was

struck by the district court due to a *Brady* error which compromised the fairness of

the trial. By characterizing the decision to strike Molina's testimony as one in

17

which the court found him not to be credible, the court inadvertently bolstered the

testimony of the government's other star witness, Mario Antonio Guevara Rivera,

also known as Blue. The jury could very reasonably – and almost necessarily –

have concluded that the district court found Guevara's testimony to be credible,

otherwise he also would have been struck. Without Molina, Guevara's highly

incriminating testimony about Aguilera was the linchpin of the government's case

against him.  Even if inadvertent, Guevara's testimony was improperly bolstered by

the district court's instruction that it had struck Molina's testimony – but not

Guevara's – when it determined Molina was not credible.

Defendant-Appellant's convictions should be reversed.

**II.    THE DISTRICT COURT ERRED IN DENYING CANALES'
MOTION FOR ACQUITTAL, OR ALTERNATIVELY FOR A NEW
TRIAL, AFTER THE STRIKING OF THE TESTIMONY OF A
CRITICAL COOPERATING WITNESS PROVED HIGHLY
PREJUDICIAL, AND INSTEAD A MISTRIAL SHOULD HAVE
BEEN DECLARED.**

A.    Standard of Review

This court reviews the denial of a Rule 29 motion *de novo*. *United States v.

Alerre*, 430 F.3d 681, 693 (4th Cir. 2005), *cert. denied*, 547 U.S. 1113, 164 L. Ed.

2d 687, 126 S. Ct. 1925 (2006). The court utilizes the more stringent "abuse of

discretion" standard of review for the denial of a motion for a new trial, "but

assesses any legal determinations [underlying the district court's decision] *de

novo*." *United States v. Garcia*, 855 F.3d 615, 619 (4th Cir. 2017) *citing*

18

*United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015).

B.    Argument

In considering the remedy to be afforded for a *Brady* violation associated with Molina's confession to a tipster that he and "Hector Naranjo" had committed the double murder charged against other defendants in the indictment, the district court indicated that it was leaning toward declaring a mistrial. JA1502. Even well after the decision was made to strike Molina's testimony, the court indicated it was "still concerned" that a mistrial was warranted. JA1546. Only upon a considered review of Molina's testimony, the breadth of the effect of the striking of his testimony, and the court's later instruction to the jury, did it become clear that a mistrial would have been the appropriate remedy. The prejudice caused by the trial court's ultimate course was irreparably prejudicial, especially to Canales.

Canales' counsel–short one attorney at the time due to illness–did not have an adequate opportunity to assess the potential consequences of a particular course, as the issue arose in the midst of this extraordinarily fast-paced trial. An effective assessment of what the appropriate remedy for each defendant required a full review of Molina's testimony, in the context of each defendant's theory of defense and planned closing summation. Short of that, Canales' counsel could only offer an impulsive response to a colleague's suggestion, *prior to* being informed that the trial court would even have considered a mistrial. In the moment, given the stage of

19

the proceedings and the co-defendants' trial scheduled to commence immediately

upon the planned conclusion of the trial only one day hence, mistrial did not

immediately come to mind as an option. But armed with that information and with

time to consider Molina's testimony and even brief the issue, Canales' "decision"

would have been different. Canales would have adopted and supplemented

Aguilera's motion for a mistrial. Were it still denied, Canales would nevertheless

have objected to the remedy of striking Molina's testimony as well as to the

instruction that it was based on a finding that he was not credible.

i.    *Striking Molina's Testimony in its Entirety and Calling Him Not
      Credible Removed From the Defense Key Exculpatory Evidence and
      Prevented the Defense from Challenging Unreliable Uncorroborated
      Inculpatory Testimony, Without Erasing the Taint of Molina's Testimony*

Molina was a "star" witness for the prosecution. Despite the trial court's

opinion that he was not helpful to the government's case, he was. And to the extent

that he was not, then striking him is inherently prejudicial to the defense. Mr.

Molina testified for nearly an entire day of trial and spoke to all aspects of the

charges against the defendants. His testimony included assertions that Mr. Canales

was a leader within the Sitios clique with whom he, "Serio," and "Blue" checked in

by phone before and after the killings of both E.L.T. and A.K.S. for authorization.

JA1266, JA1287, JA1298, JA1312, JA1319, JA1322. But Blue did not testify that

he had done so, and no phone records offered in evidence bore that out; therefore,

this testimony by Molina could be independently challenged by the lack of

20

evidence supporting his assertions that of the multiple calls alleged, no records exist of any of them.

Molina also testified that Blue had threatened his son if he did not pay money to the clique for a gun seized during the search of Molina's home. JA1285. This supports the argument made that Blue was a rogue member, prone to random acts of violence outside of gang rules.

Most importantly, however, Molina testified on both direct and cross-examination that he did not shoot E.L.T. because "he had nothing to do about it" and he "was not a rival member." JA1296. He confirmed that Canales did not order him to kill E.L.T. and that the rules of the gang are that you cannot shoot people randomly and indiscriminately. JA1417. Even on redirect, asked whether he had authorization "to go out and look for rivals," and from whom, he stated "yes," and "Demente." JA1418. "Looking for chavalas" is a far cry from random shootings of non-rivals or even unverified suspected rivals, and the only evidence of any "order" to kill by Canales was testimony from Molina and Blue that four months prior to the E.L.T. shooting, Canales brought up at a meeting that El Salvador wanted members to rank up and that to rank up they had to "murder rival members." JA1277. These points were critical to Canales' defense—that he would not have and did not conspire to, or aid and abet, the killing of someone outside of the rules of the gang, i.e., a random person such as E.L.T..

21

Canales gave no such order that night, and gave a very different order four months prior. While some of these points were implicated by other evidence and testimony, none was so strong as Molina's statements elicited on direct, cross, and redirect examination, regarding the specific topic of what Canales intended for fellow clique members to do. The trial court's instruction that Molina was "not credible" discounted this crucial testimony and removed it from the defense arsenal, along with the challenge to the portions of his testimony that were easily challenged as unsupported by other evidence, as noted above.

    ii.    *The Reason Given for Striking Molina's Testimony Was Not Accurate*

Not all of Molina's testimony was found "not credible." There was *one* point on which the new *Brady* touched, and that was on Molina's explanation for his statement to police and the attendant possibility that he had participated in the double homicide. This was only a small part of his testimony, however, and was not about a defendant or even a murder presently on trial. In fact, his testimony was stricken because there was a *Brady* violation, which bears on the fairness to the defense and their ability to prepare for trial—not Molina's credibility. While it is possible a defendant may have moved to exclude Molina prior to his testimony had that *Brady* violation been realized sooner, that strategic decision would have been one for each defense team to make and make carefully, and any disagreement on that point amongst defendants may have then been grounds for severance. In any

22

event, that would have ideally been done prior to the jury hearing from Molina at all, and the subject of the tipster information would have been a subject of cross-examination.

Once Molina testified, however, the complexity and gravity of this decision amplified and required more time and individual consideration of the ramifications by and as to each defendant. The trial court's inaccurate instruction to the jury –that Molina's "testimony" was "not credible," and telling the jury to disregard everything he said–removed from the jury's consideration exculpatory testimony, given on direct, cross and redirect, as to Canales. Striking Molina *in toto* also removed from consideration by the jury, and argument by counsel, effective challenges to his and Blue's inculpatory testimony, especially highlighting areas of conflict between them. Canales' planned closing argument was decimated, as it had been crafted throughout trial to include what Molina was expected to say–and and ultimately did say–on the stand.

iii.    *Striking Molina's Testimony Based on a Finding he was "Not Credible" Bolstered the Credibility of Other Witnesses, Gravely Prejudicing Canales*

Instructing the jury that Molina was wholly excluded because he was deemed "not credible" by the trial court also bolstered the testimony and credibility of other witnesses—most especially Blue. The jury could reasonably conclude that had Blue not been credible, he would also have been excluded, as if it is the normal course of

23

trial practice. In addition, where Blue and Molina differed on an important point—a happenstance that could otherwise render both of their testimony on that point unreliable—the jury was left only with Blue's version, bolstered not only by the implication within the trial court's instruction, but by the elimination of conflicting testimony and argument thereon. Coupling this with the reality that it would be nearly impossible for the jury to wholly disregard Molina, the striking of his testimony merely rendered him off limits for closing argument, which was, as noted above, highly prejudicial to Canales. While the jury's verdict as to Canales is confusing, at best, the strong indication is that the matter of his "intent" with respect to E.L.T. resulted in conviction on both the conspiracy and aiding and abetting counts, on which point Molina's testimony was exculpatory.

  iv. *The Prejudice to Canales is Evident in the Jury's Irreconcilable Verdict*

  Where a mistrial is denied after the introduction of improper evidence, reversal on appeal is required only where there is a "reasonable possibility that the jury's verdict was influenced by the improper material." *United States v. Seeright*, 978 F.2d 842, 849 (4th Cir. 1992). The Court clearly recognized that very possibility when it was inclined, as noted twice on the record, to grant a mistrial. But the larger issue is that if the jury was influenced by the excluded testimony, precluding counsel from referencing it only exacerbates the prejudicial effect.

It is no small matter that Canales was convicted of a murder of which an accused participant was acquitted, ostensibly on the self-defense grounds presented at trial. During the course of pretrial motions and status hearings, the trial court had at one point acknowledged that defendants charged with the E.L.T. murder could rise and fall on that defense which was put forth so effectively by Andrade's defense team. JA163. To be sure, Canales did not rely solely on that defense (since he was not present for the shooting), but also on the defense that he could not and would not have conspired to, ordered, aided, abetted, or otherwise supported the murder E.L.T. or any other random individual walking down the street.

Canales wasn't even present for a shooting that the jury found was not a murder as to a co-defendant who was 1) out following the alleged "order" and 2) who was also convicted of conspiracy to commit murder, but not of the substantive count. Canales was convicted of aiding and abetting a murder that the only other defendant charged in his trial did not commit, and which, under the theory of self-defense, did not occur. Canales submits that there are additional legal grounds for entering judgment of acquittal, but this confusing verdict is perhaps explained in part by the striking of Molina's exculpatory testimony. In fact, it is otherwise inexplicable especially in light of Canales' acquittal on the gun charge, despite telling Blue to give the gun to Serio so the members could have it while patrolling.

25

v. *The Ends of Justice Require Acquittal Despite the Lack of Contemporaneous Objection to the Court's Decision to Strike Molina and the Instruction to the Jury*

Canales's motions pursuant to FRCP 29 and 33 were timely made, and to the extent they are based on matters for which objections were not fully preserved, the ends of justice still dictate that his conviction on counts 9 and 10, as well as the special finding as to Count 1 should not stand.

It is unfortunate that the gravity of the decision as to Molina's testimony has become crystallized after the fact, but full review of his testimony was not possible at the time. This is only one reason why *Brady* and FRCP 5(f) require timely disclosure of exculpatory evidence. Form over substance cannot rule the day when a sentence of life without parole is at stake. Surprise, mid-trial, regarding a key witness who has already testified, is untenable and this case illustrates why. Counsel was moving through trial at a very fast pace and was expecting to close on the morning that this issue arose. Counsel did not have time to fully consider the matter let alone research and brief/argue it. Had counsel been able to review Molina's testimony in the context of the question of a proper remedy for the *Brady* violation, counsel would not have consented to his testimony being stricken in its totality and would have objected to the instruction that he was found "not credible." Instead, counsel was given a short time to consider the issue while at the same time looking at her closing and deciding whether and how it could be altered in time to

26

present it that very day without mentioning Molina. The scenario is one in which

knowing and informed decisions could not be, and therefore were not, made.

## III.  THE DISTRICT COURT ERRONEOUSLY INSTRUCTED THE JURY PERMITTING IT TO DETERMINE THAT APPELLANT MANILESTER ANDRADE RIVAS CONSPIRED TO MURDER E.L.T. UPON EVIDENCE OF SECOND DEGREE MURDER.

### A.    Standard of Review

This Court will review the district court's instructions to the jury for an

abuse of discretion. *United States v. Ravenell,* 66 F.4th 472, 480 (4th Cir. 2023)

### B.    Argument

Count Nine of the Second Superseding Indictment (SSI) charged that Mani

conspired with others to murder E.L.T. in violation of Sections 18.2-22 and 18.2-32

of the Virginia Code.  The overarching accusation of Count Nine, set forth in Count

One, is that the alleged conduct was committed in aid of racketeering in violation

of 18 U.S.C. §1959(a)(5).  JA108-109.  Counts One and Nine charge that the

defendants' purpose in the conspiracy was to obtain an increased position in MS

13. JA123.

Conspiracy is a specific intent crime under the common law of Virginia.

*Commonwealth v. Abdo*, 64 Va.App. 468, 476, 769 S.E.2d 677, 681 (2015)

Count One, alleging the racketeering conspiracy, amplifies this intent.  It

claims in pertinent part that Mani and his co-conspirators "armed themselves with

firearms and knives and sought out an individual to murder . . ." to increase

27

position in MS-13. JA109. This charge contends that Mani conspired to murder

E.L.T..

Section 18.2-32 Virginia Code defines first and second degree murder.

Premeditation is a necessary element of first degree murder.  Second degree murder

does not require premeditation.  "To premeditate means to adopt a specific intent to

kill, and that is what distinguishes first and second degree murder." *Rhodes v.*

*Commonwealth,* 238 Va. 480, 485-486, 384 S.E.2d 95, 98 (1989)(citation omitted).

When the district court charged the jury on Count Nine, conspiracy to

commit murder in aid of racketeering, it erroneously included the elements of

second degree murder in its instruction.[4]

There can be no conspiracy to commit second degree murder.  Conspiracy

requires agreement, a knowing and willful act.  Second degree murder, by

---

[4]  The Court instructed in pertinent part:

[i]n interpreting Section 18.2-32 of the Virginia
code, Virginia courts have defined second-degree
murder as having the following elements: One,
that the perpetrator killed a person; and, two,
be (*sic*) that the killing was done with malice.

Once the government has proved that there was an
unlawful killing, there exists an inference that
there was malice and that the act was murder in
the second degree, unless from all the evidence,
there is a reasonable doubt as to whether malice
existed.  (JA1663-1664; JA1670; JA1672-1673)

definition, excludes premeditation.  It is both illogical and legally unsustainable to maintain that Mani conspired with others to kill E.L.T. without premeditation, planning and specific intent.  *Mitchell v. State,* 767 A.2d 844, 853-854, 363 Md. 130, 146-148 (2001), *People v. Hammond*, 187 Mich.App. 105, 107-108, 466 N.W.2d 335, 336-337 (Mich. App. 1991), *Laird v. Horn,* 414 F.3d 419, 427 (3rd Cir. 2005) (*see* Government's proposed instructions 54, 58 and 46) (JA352; JA356; JA347)

The offense charged does not exist.

This instruction erroneously permitted the jury to find Mani guilty of conspiring to commit second degree murder alleged in Counts One and Nine.  The Court's instructions relieved the jury of the burden of finding that Mani had specific intent to kill E.L.T..  "That kind of inconsistency would either broaden the crime of conspiracy, by eroding the specific intent necessary for that crime, or create greater uncertainty in the meaning of deliberation and premeditation." *Mitchell v. State*, 767 A.2d at 854-855, 363 Md. at 149

i.      *The Error Was Not Harmless*

The Government's burden to establish that the district court's error in its instruction to the jury on Mani's guilt of conspiracy to murder E.L.T. is that such error was harmless beyond a reasonable doubt.  *Chapman v. California,* 386 U.S. 18, 24-25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711 (1967)  The district court

29

instructed the jury on murder under Section 18.2-32 Virginia Code which defines both first and second degree murder. The Government vigorously pressed a case against Mani on the theory that he and his alleged co-conspirators hunted for a rival, in advance, to kill for purposes of obtaining higher rank within their clique. The Government did not through evidence or argument suggest Mani or his alleged co-conspirators lacked pre-meditation to attain its alleged objective. Nor did it present an alternative theory for his guilt.

The Government defended its proposed instruction 54 containing the elements of second degree murder before the court's charge to the jury. JA1514-1517. And it defended its position as a fall back after trial on the post trial motions. The MS-13 members were promoted after E.L.T.'s death as "these men had already eaten." JA1781-1784; JA1792-1793.

The verdict form did not provide the jury with specific findings to identify the degree of murder to support the conspiracy alleged, as to Count One (racketeering conspiracy) or Count Nine (conspiracy to murder E.L.T.). JA1749-1750. It is impossible to determine from the record whether the jury found Mani guilty of conspiracy to murder in the first or second degree under Virginia law.

Because of error in the court's instructions, the jury could, and may have concluded Mani's guilt of conspiracy to murder *without* finding on the evidence that he planned in advance to do so.

30

That the jury acquitted Mani of Count Ten alleging his murder of E.L.T. underscores the court's misdirection in its instruction to the jury on conspiracy to commit murder. JA1750. The government cannot establish that the trial court's error in this instruction was harmless beyond a reasonable doubt. *Laird v. Horn*, 414 F.3d at 428-429.

**IV.    THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT THE EVIDENCE SUPPORTED THE JURY'S VERDICT AGAINST CANALES ON COUNTS 9 AND 10, AND THE SPECIAL FINDING AS TO COUNT 1, WHERE THE GOVERNMENT PRESENTED NO EVIDENCE THAT CANALES CONSPIRED WITH OR AIDED OR ABETTED OTHERS WITH SPECIFIC INTENT TO MURDER E.L.T.**

A.    Standard of Review

As previously noted, this court reviews the denial of a Rule 29 motion *de novo*. *Alerre*, *supra*.

While "[c]onvicted defendants who challenge the sufficiency of the evidence against them face 'a heavy burden'" *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (quotation marks removed), this is not an insurmountable burden. *United States v. Habegger*, 370 F.3d 441, 444-445 (4th Cir. 2004). This Court must view the evidence in the light "most favorable to the prosecution" and assume the jury resolved all credibility disputes in the government's favor. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). However, a jury is entitled to make only reasonable inferences from the evidence. *See, United States v. Samad*, 754 F.2d 1091, 1097 (4th Cir. 1984) (quoting *United States v. Orrico*,

31

599 F.2d 113, 117 (6th Cir. 1979)).

 "[The Court] must uphold the jury's verdict if it is supported by 'substantial evidence,' which means 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.' *United States v. Smith,* 451 F.3d 209, 216 (4th Cir. 2006)." *United States v. Gallagher*, 90 F.4th Cir. 182, 190 (4th Cir. 2024).

B.    Argument

The jury's verdict cannot stand because the requisite intent for conspiracy and aiding and abetting was not proved.

   i.    *Conspiracy to Commit Murder in Aid of Racketeering Requires Intent to Kill Victim*

"To prove a conspiracy, . . . , the government must establish an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy. *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999). There was no agreement to murder E.L.T. and Canales didn't willingly participate in an agreement to murder E.L.T. His participation in the racketeering conspiracy notwithstanding, he never intended that E.L.T. would be killed.

This Court has dealt with the requisite intent for conspiracy to commit murder *in aid of racketeering* in an unpublished opinion. *United States v. Barnett*, 660 Fed. App'x. 235 (4th Cir. 2016), unpub. involved multiple gang-related killings, in which this court held that where there was no evidence that the

32

defendant intended to kill a particular victim, then that conviction could not stand. In *Barnett*, the defendant and a co-defendant and fellow gang member spoke on the phone about a potential target allegedly "snitching." The discussion was that the gang's leader had said "if that's true" the victim is "OO." Evidence at trial showed that "OO" meant a "mission," which could be to follow any order (much like patrolling does not mean to "kill"). But, before doing anything, they had to "just get to the bottom of it." This court held that with no other evidence suggesting that the defendant agreed that the target would be killed, "no rational trier of fact could find, beyond a reasonable doubt, the requisite intent to murder."

Canales did not even have E.L.T. in mind when four months prior, the plan to promote clique members was discussed. Nor did he have E.L.T. in mind on the evening of the shooting when he allegedly authorized clique members to go out and "look for chavalas." E.L.T. was not a chavala. Looking for chavalas is not necessarily killing them, and ample evidence came in through Blue and Molina that random people should not be killed and suspected chavalas must be confirmed. It's simply a *fact* that Canales did not have the requisite intent that E.L.T. be killed to be guilty of conspiracy to murder him. *Even* if one can conspire to kill a category of person, without specifying an individual, E.L.T. would not and did not fall into the category at issue in this case, i.e., rival gang members. And to be sure, Canales *was not there*, so at no time did he see E.L.T., suspect him of being a rival, or join in any plan

33

whatsoever to kill him. Molina, who *was present*, was sure E.L.T. was not a chavala.

> ii.   *Aiding and Abetting Requires Specific Intent that the Charged Offense Be Committed Prior to or During its Commission*

"VICAR murder requires: (1) there be an enterprise' as defined in 18 U.S.C.

§ 1959(b)(2); (2) the enterprise be engaged in 'racketeering activity,' as defined

in § 1961; (3) the defendant committed a murder; (4) the murder violated state or

federal law; and (5) the murder was committed for a pecuniary purpose or for the

purpose of gaining entrance to or maintaining or increasing position in the

enterprise. *See United States v. Ortiz-Orellana*, 90 F.4th 689, 701 (4th Cir. 2024)."

*United States v. Tipton*, 95 F.4th 831, 847 (4th Cir. 2024). The evidence against

Canales was insufficient to prove the third element beyond a reasonable doubt.

> To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture. *Nye & Nissen v. United States*, 336 U.S. 613, 619, 620, 93 L. Ed. 919, 69 S. Ct. 766 (1949); *United States v. Beck*, 615 F2d 441, 448 (7th Cir. 1980); *United States v. Pearlstein*, 576 F2d 531, 546 (3d Cir. 1978); *United States v. Di Stefano*, 555 F2d 1094, 1103 (2d Cir. 1977). To prove the element of association, the government must show that the defendant shared in the principals' criminal intent. *United States v. Beck*, 615 F2d at 449. This requires evidence that the defendant be aware of the principals' criminal intent and the unlawful nature of their acts. *United States v. Pearlstein*, 576 F2d at 546.

*United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983). For example, even "a

criminal defendant's [] presence at the scene of the crime or his knowledge of that

crime is insufficient to establish that he joined a conspiracy or aided and abetted in

34

the commission of the crime. Instead, the defendant's *active, knowing participation* is required before a conviction may be entered." *United States v. Love*, 767 F.2d 1052, 1059 (4th Cir. 1985) (emphasis added) (citing *United States v. Weil*, 561 F.2d 1109, 1112 (4th Cir. 1977)). *See, also, Rosemond v. United States*, 572 U.S. 65, 71, 188 L.Ed.2d 248, 134 S. Ct. 1240 (2014) (". . . those who provide *knowing aid* to persons committing federal crimes, with the intent to facilitate *the* crime, are themselves committing a crime") (emphasis added) (citation omitted).

"Well-established precedent hold[s] that the elements of aiding and abetting a crime are [] synonymous with those of the principal offense." *United States v. Draven*, 77 F.4th 307, 318 (4th Cir. 2023). Murder, be it first or second degree, requires the willful, deliberate, premeditated, and intentional killing of the victim. *See United States v. Jackson*, 32 F.4th 278, 286 (4th Cir. 2022). To sustain a defendant's conviction as an aider and abettor, the government "must establish that the defendant participated in the principal's criminal intent and the unlawfulness of his activity," and "only participation at some stage accompanied by knowledge of the result and intent to bring about that result," is required. *United States v. Thomas*, 58 F. App'x 952, 956 (4th Cir. 2003), unpub. (quoting *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (en banc), cert. denied 519 U.S. 1151, 117 S.Ct. 1087, 137 LN.Ed.2d 221 (1997)) (emphasis added). While the precise identity of a victim need not be known to an aider or abettor for there to be "intent

to kill," there must be an intent to kill the victim. For example, in *United States v. Simmons* an order was given by the defendant to fellow gang members to kill a rival and any of his associates who didn't abandon the intended victim. Two men refused to abandon the intended target and were killed. The defendant intended that specific result: that those victims would be killed because they met the conditions set forth in the order. *United States v. Simmons*, 11 F.4th 239, 271 (4th Cir. 2021). In the case at bar, Canales—even taking the evidence in the light most favorable to the United States—suggested that the lower ranking members needed to rank up by targeting and killing chavalas; an order to that effect was ultimately given by Astuto, who held the first word. E.L.T. did not qualify, and as Molina testified, "he had nothing to do with anything," and Canales did not and would not have ordered his killing.

There was no evidence that Canales instigated, planned, or gave aid to others in an effort and with the intent to kill E.L.T., who was by all accounts randomly encountered by those present for the shooting. Evidence strongly suggests, in fact, that E.L.T. shot first, drawing return fire by STLS members who were present— which did not include Canales.

The clique members were going out to patrol, and as Canales told Blue, he should lend them his gun because it would be on him (Blue) "if anything happened to them." But with regard to killing chavalas as opposed to simply looking for

them, Canales told Blue in July 2019 (months after the alleged "order to kill") that,

"You're not going to go out on a limb . . . It has to be planned right. Get me the

letters so we can see what is going on there," JA1913. Blue's testimony also

confirmed there was a process by which suspected chavalas were investigated and

their names put on a list of targets. See, e.g., JA771-772, JA867-868. Confirmation

was required, which was why hence his concern that the second victim of the

double murder would not "count." JA772.

The acquittal of Andrade as well cannot be reconciled with the idea that the

jury found that E.L.T. was killed in accordance with gang rules or orders, or any

order given by Canales. Regardless, where the jury's verdict is supportable on one

ground, but not another, and it is impossible to determine on what grounds the jury

relied, the verdict should be set aside. *Yates v. United States*, 354 U.S. 298, 311–12,

77 S. Ct. 1064, 1073, 1 LN. Ed. 2d 1356 (1957), overruled on other grounds by

*Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 LN. Ed. 2d 1 (1978) (in Smith

Act prosecution, in order to convict, the jury was required to find an overt act which

was 'knowingly done in furtherance of an object or purpose of the conspiracy

charged in the indictment;' the court said "we have no way of knowing whether the

overt act found by the jury was one which it believed to be in furtherance of the

'advocacy' rather than the 'organizing' objective of the alleged conspiracy").

37

### iii.    Aiding and Abetting Requires Commission of the Substantive Offense

This jury made no finding that anyone committed the substantive offense of murdering E.L.T. The acquittal of Andrade who was actually present when E.L.T. was shot suggests that self-defense was accepted by the jury, which would mean that E.L.T. was not "murdered" under the law. In the context of this case, therefore, Canales' conviction of aiding and abetting murder cannot stand. The jury instruction and law are clear:

> Before a defendant may be found guilty as an aider or an abettor to a crime, the government must also prove, beyond a reasonable doubt, that some person or persons committed each of the essential elements of the crime charged as detailed for you in these instructions.

The jury was not asked to and did not make a finding that "some person or persons" committed the murder of E.L.T. and in fact acquitted the only co-defendant accused of that murder. The Court should *not* presume, in light of the self-defense claim which resulted in the acquittal of Andrade, that the jury found that "some person or persons committed each or any of the essential elements of the murder of E.L.T." without a specific finding.

**V.   THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT EVIDENCE SUPPORTED THE JURY'S VERDICT THAT ANDRADE CONSPIRED TO MURDER E.L.T. WHERE THE GOVERNMENT PRESENTED NO EVIDENCE THAT ANDRADE CONSPIRED WITH SPECIFIC INTENT TO MURDER E.L.T.**

A.   Standard of Review

This Court will review *de novo* the district court's ruling on a motion for judgment of acquittal and will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence. (citation omitted)  Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." (citations omitted) *United States v. Kingrea,* 573 F.3d 186, 194 (4th Cir. 2009).

B.   Argument

Count Nine of the second superseding indictment charged that in "maintaining and increasing position in MS-13" . . . Mani and his alleged co-conspirators agreed "to murder E.L.T. . . ."  The Government presented no evidence to support its identification of E.L.T. as the individual who was subject of the alleged agreement.  The Government's evidence, viewed in the most favorable light, showed that in August, 2019 Mani, Serio, Canales and Wiso traveled to Woodbridge, Virginia.  They "patrolled" an area where they believed they might find rival gang members "to engage or murder" JA985; JA1009-1010. Referring to

39

the individual involved in the shooting, Mani said that they were not looking for him. JA2188. During his interrogation by law enforcement Mani repeatedly and without contradiction told his inquisitors that he did not know who this person was. JA2184-2186. Mani said that it was really, really dark; that you could only see a silhouette; that you could see the sparks when the gun fired; and that he believed the other person shot first "because he shot everything." JA2188; JA2194-2195.

Blue was not present during the firing just mentioned, but related Serio's account of it to the jury. On cross-examination Blue, based on Serio's account, admitted that he (Blue) in his earlier statement to law enforcement told the agents that Mani instructed Serio not to shoot, saying "don't do it." JA841-842. More to the point, neither Serio nor Blue identified E.L.T. as the subject of the alleged conspiracy to murder.

Under Virginia common law conspiracy was a specific intent crime. *Commonwealth v. Abdo*, 64 Va.App. at 476, 769 S.E.2d at 681 (2015)  Virginia Code Section 18.2-22, charged in Count Nine, does not define "conspire". "An agreement requires a plurality of intent, a meeting of the minds." *Fortune v. Commonwealth,* 12 Va.App.643, 646-647, 406 S.E.2d 47, 49 (1991)  Neither Mani nor his alleged co-conspirators knew E.L.T. when they embarked on their patrol. Nor did they know who E.L.T. was when he fired upon them. They did not know

40

if he was a rival, a gang member or a mere bystander. The government produced
no evidence showing otherwise.

The Court erroneously denied Mani's post trial Rules 29 and 33 motion for
judgment of acquittal or for new trial, in that the Government failed to present any
evidence establishing that Mani specifically intended to conspire to murder E.L.T..
JA1799-1801. No rational trier of fact could find beyond a reasonable doubt the
requisite intent to murder E.L.T.. *United States v. Barnett*, 660 F.App'x 235, 250
(4th Cir. 2016) (unpublished, Nos. 14-4866 and 14-4885, decided October 12, 2016;
at pages 32-36), *Mitchell v. State,* 767 A.2d at 851-854, 363 Md. at 142-148
(2001), *People v. Hammond*, 187 Mich.App. at 108, 466 N.W.2d at 337.

## VI.   THE DISTRICT COURT ERRED IN DENYING CANALES' MOTION TO SUPPRESS.

### A.   Statement of Additional Facts

During the investigation into the Woodbridge shootings, an individual
arrested on state charges identified Canales as "number two" in STLS. In the
Spring of 2020, Canales was the subject of a "sting" operation involving the
controlled purchases of cocaine by an undercover officer, resulting in his arrest on
drug charges in May 2020. *See* JA1133-1154 At the time of his arrest, two
telephones were seized from his person—a black Apple iPhone and a Samsung
phone. Federal search warrants were obtained for both devices, both of which
permitted an overbroad and insufficiently particularized search of the entirety of

41

these devices. *See* JA2207-2255. A federal search warrant was also issued for an Acura Sedan associated with Canales. Included in said warrant was permission to seize and search a wealth of containers and/or items that might be found *within* the vehicle, *including* electronic devices. *See* JA2256-2297. This warrant too—especially as it extends to containers and devices that might be found within the vehicle without requiring a separate showing of probable cause—was overbroad and insufficiently particularized.

Relying on the *vehicle* warrant, law enforcement conducted an extraction of a third phone Rose Gold iPhone which was found in the vehicle, but law enforcement was only able to complete a partial extraction due to software limitations. Therefore, in November 2021, a separate search warrant for the Rose Gold iPhone was sought, and granted, on the grounds that improvements in extraction software would now permit law enforcement to obtain a full extraction of the device. *See* JA2298-2330.

Finally, two warrants were issued for iCloud accounts attributed to Canales. *See* JA2331-2410  These warrants place a temporal limitation on certain classes of data, but the time period commences on January 1, 2017 – a full 2.5 years prior to the first shooting and *three* years prior to the drug "sting." *Id.* The more  egregious violation is found in the "catch-all" provisions such as:

> The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and

other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

and

All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

B.   Standard of Review

On appeal, the court reviews the factual findings underlying the trial court's

denial of a motion to suppress for clear error, and the trial court's legal conclusions *de*

*novo*. *United States v. Wilson,* 484 F.3d 267, 280 (4th Cir. 2007). When evaluating the

denial of a suppression motion, the court views in the light most to the prevailing

party. *United State v. Uzenski,* 434 F.3d 690, 704 (4th Cir. 2006).

C.   Argument

The Fourth Amendment of the United States Constitution commands that a

warrant should only be issued upon a finding of probable cause and that the warrant

43

must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "These words are precise and clear." *Stanford v. Texas*, 379 U.S. 476, 481 (1965). A court reviewing the sufficiency of a search warrant must ensure that a "substantial basis" for determining probable cause existed, that the warrant was not "a mere ratification of the bare conclusions of others," and that the warrant process did "not serve merely as a rubber stamp for the police." *United States v. Leon*, 468 U.S. 897, 914-15 (1984); *see also United States v. Griffith*, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (good faith exception cannot save facially insufficient warrant).

The Fourth Amendment's particularity requirement prohibits warrants that give law enforcement "unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009). A warrant must "set out with particularity" the "scope of the authorized search," *Kentucky v. King*, 563 U.S. 452, 459 (2011), which "is closely tied to the requirement of probable cause." *Griffith*, 867 F.3d at 1275. This requirement constrains law enforcement by "prevent[ing] the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927). Further, "a properly particularized warrant" leaves nothing to "the discretion of the officer execution [it]," making "general searches," which are prohibited by the Fourth Amendment, "impossible." *Id.* By ensuring that a search is "carefully tailored to its justifications," the

44

particularity requirement ensures that a search "will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 489 U.S. 79, 84 (1987).

The above mandates certainly apply to searches of cell phones. The U.S. Supreme Court has held that a modern cell phone deserves the most stringent privacy protections ensured by the Fourth Amendment. *Riley v. California,* 573 U.S. 373, 134 S.Ct. 2473 (2014). As the *Riley* court noted, modern cell phones "are in fact minicomputers that also happen to have the capacity to be used as a telephone." *Riley,* 573 U.S. at 393, 34 S. Ct. at 2489. Considering that common cell phones can contain many gigabytes of data, including "millions of pages of text, thousands of pictures, or hundreds of videos" as well as geolocation data that can date back years, warrants to search such devices run the risk of sweeping in large quantities of information wholly unconnected with the suspected criminal activity. *Id.*

In other words, cell phones can contain "[t]he sum of an individual's private life," and implicate collected information about a person of unprecedented type, scope, and depth. *Id.* Permitting a government search of data on a cell phone exposes "a digital record of nearly every aspect of [people's] lives—from the mundane to the intimate." *Id.* at 2490. For example, the Supreme Court found that the data contained within modern cell phones regularly included protected

45

information ranging from "an individual's private interests or concerns," and "a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.* (quoting *United States v. Jones*, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring)). The Supreme Court expressly condemned police rummaging through cell phones seized incident to arrest and found that a cell phone search extends further than even the privacy invasion occasioned by the "ransacking [of a person's] house for everything which may incriminate him" because such a search "expose[s] to the government far *more* than the most exhaustive search of a house." *Id.* at 2491 (quoting *United States v. Kirschenblatt*, 16 F.2d 202, 203 (2d Cir. 1926)).

Where the government is barred from unrestricted rummaging through a cell phone upon arrest and seizure of a person, the government must equally be barred from rummaging through such data without making a particularized showing in a warrant justifying the search of pertinent electronic files, otherwise *Riley* would be rendered meaningless, as law enforcement could obtain a warrant to search the entirety of a person's cell phone every time the government merely suspects that a crime has been committed. In light of *Riley*, courts therefore have condemned warrants for the entire contents of cell phones that fail to adhere to the probable cause and particularity mandates of Fourth Amendment. *See e.g. Burns v. United States*, 235 A.3d 758 (D.C. 2020) (striking down overbroad warrant for entire

contents of cell phone that provided probable for only narrow categories of data);

*United States v. Winn*, 79 F. Supp. 3rd 904, 909 (S.D. Ill. 2015) (same).

"Cloud" accounts are no different than cell phones in that they contain a

person's entire private life. In fact, more and more, the "cloud" account actually

holds the data that one accesses through the cell phone, which is why we can now

set up a new telephone in minutes provided we have a "cloud backup." For

purposes of this analysis, one's "cloud" account such as Mr. Canales Saldana's

iCloud accounts at issue are indistinguishable from a Fourth Amendment

perspective from the physical devices.

Law enforcement unjustifiably seized and searched the entire contents of

Canales' cell phones and iCloud accounts based on warrant affidavits that provided

probable cause for limited and discrete items linked to point in time offenses. There

was no probable cause articulated to permit the sweeping search sought and

conducted by law enforcement and yet, the warrants that were issued were in effect

general warrants which are prohibited by the Fourth Amendment. "[T]he problem

[posed by warrants lacking in specificity] is not that of intrusion *per se*, but of a

general, exploratory rummaging of a person's belongings…. [The Fourth

Amendment addresses the problem] by requiring a 'particular description' of the

things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  This

requirement "makes general searches…impossible and prevents the seizure of one

thing under a warrant describing another. As to what is to be taken, nothing is left

47

to the discretion of the officer executing the warrant." *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). By ensuring that a search is "carefully tailored to its justifications," the particularity requirement ensures that a search "will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 489 U.S. 79, 84 (1987).

The District of Columbia Court of Appeals recently addressed the problem of warrants for cell phones that provide probable cause for only narrow categories of data but nonetheless authorize the review of the entire contents of cell phones, striking down such warrants in *Burns v. United States*, 235 A.3d 758 (D.C. 2020). The warrants in *Burns,* like here, authorized a review of the complete contents of seized phones, which resulted in law enforcement finding incriminating internet searches. Repeatedly citing *Riley*, the *Burns* court recognized that "a modern cell phone [is] capable of holding an extraordinary amount of personal information related to the user and/or owner of the device" and held:

> Police sought search warrants that authorized an unlimited review of the contents of his cell phones for "any evidence" of murder even though the warrants were supported by affidavits that established probable cause for only three narrow and discrete items of data. The warrants were thus overbroad and lacking in probable cause and particularity, and the warrant judge should not have issued them.

*Id.* at 767.

48

The *Burns*' Court further rejected the government's claim that the search

should be salvaged by the exclusionary rule's good faith exception:

> The warrants' deficiencies, moreover, were so extreme and apparent
> that a reasonably well-trained police officer, with reasonable
> knowledge of what the law prohibits, would have known the warrants
> were invalid notwithstanding their approval by a judge. The good faith
> exception to the exclusionary rule therefore does not apply, and the
> trial judge should have granted Mr. Burns's motion to suppress all of
> the data collected from both phones.

*Id.*

Similarly, in *United States v. Winn*, the defendant was suspected of using his

cell phone to take photographs and/or videos of young girls in swimsuits without

their parents' permission. 79 F. Supp. 3rd 904, 909 (S.D. Ill. 2015). Law

enforcement sought and obtained a search warrant for the defendant's phone that

authorized the collection of "any or all files contained on the cell phone and its

memory card that constituted evidence of the offense of Public Indecency." *Id.* at

910-911. Additionally, the warrant permitted seizure of data "including, but not

limited to, the calendar, phonebook, contacts, SMS messages, MMS messages,

emails, pictures, videos, images, ringtones, audio files, all call logs, installed

application data, GPS information, WIFI information, internet history and usage,

any system files, and any deleted data." *Id.* at 919.

While the *Winn* court found probable cause to believe that the defendant's

phone contained evidence of the suspected crime, it found the warrant to be

49

impermissibly overbroad and therefore in violation of the Fourth Amendment. In

doing so, the district court noted several important considerations. First, the court

found that the warrant's authorization to search "any or all files" was fatal because

there was no probable cause whatsoever to believe that all data on the phone was

evidence of a crime. *Id.* Indeed, the *Winn* court noted that numerous categories of

data sought by the police, such as the calendar, phonebook, contacts, etc., had no

connection whatsoever to the suspected offense. *Id.* at 919-920. The court stated:

> The bottom line is that if Detective Lambert wanted to seize every type of
> data from the cell phone, then it was incumbent upon him to explain in the
> complaint how and why each type of data was connected to Winn's criminal
> activity, and he did not do so. Consequently, the warrant was overbroad,
> because it allowed the police to search for and seize broad swaths of data
> without probable cause to believe it constituted evidence of public
> indecency.

*Id.* at 920.

In addition, the *Winn* court disapproved of the overbroad authorization to

seize even those categories of data for which probable cause existed—photos and

video—without any attendant limitations to subject matter and time. *Id*. As such,

the court noted that the warrant should have limited the seizure of photos and video

solely to those images connected with the criminal investigation and restricted a

timeframe to the date of the suspected offense. *Id.* at 920. Noting that the warrant

"allowed precisely the kind of rummaging through a person's belongings, in search

of evidence of even previously unsuspected crimes or of no crime at all, that the

50

Fourth Amendment proscribes," the *Winn* court refused to endorse such a facially overbroad warrant. *Id*.; *see also*, *In re Search of Black iPhone 4*, 27 F.Supp.3d 74, 78 (D.D.C. 2014) (refusing to issue warrant where government sought to search all records for seized phone because "[t]hat is precisely the type of general exploratory rummaging in a person's belongings that the Fourth Amendment prohibits").

In another analogous case from September of 2021, the Delaware Supreme Court struck down warrants to search smart phones that were unlimited in time *and scope*. *Taylor v. Delaware* (Del. S. Ct. No. 91, 2020) at *1. In *Taylor*, the appellant (Taylor) was a gang member who alleged participated in a "series of violent crimes" during the month of May 2016, including a murder. *Id.* at *2, 15. Upon Taylor's arrest, two smart phones were seized from his person. A police detective obtained a warrant for every conceivable data type on the smart phones. In the warrant affidavit, "the Detective recounted the gang-related shooting incidents, the gang and personal connections among those involved, the smartphones found in Taylor's pockets" and further stated that "her training, knowledge, and experience led her to believe that people involved in criminal acts like those described in her affidavit use smartphones to communicate about their illegal acts." *Id.* at * 13.

Citing the privacy concerns set forth in *Riley*, the court stated, "electronic devices require greater protections than other forms of property, given the 'enormous potential for privacy violations' that 'unconstrained searches' of these

51

devices pose." *Id.* at 23 (internal citation omitted). The court found that the warrant provided no justification for "any and all data" and "the search could have been limited to smartphone data tied specifically to the probable cause supporting the warrant." *Id.* at *17-26. The Delaware Supreme Court concluded that the overbroad warrant violated the Fourth Amendment's particularity requirement because it "allowed investigators to conduct an unconstitutional rummaging through all of the contents of Taylor's smartphones to find whatever they decided might be of interest to their investigation." *Id.* at 25.

The warrants at issue in this case suffered from the same overbreadth and constitutional infirmity condemned in *Winn, Burns* and *Taylor*. The warrants provided either no tailoring whatsoever or insufficient tailoring and encourage precisely the sort of unbridled hunt for evidence forbidden by the Fourth Amendment. *See Coolidge*, 403 U.S. at 467. The consequence of this is clear—law enforcement conducted a full data extraction from the cell phones and the entirety of Canales' iCloud accounts, seizing thousands of digital files without any articulated probable cause to believe that large swaths of the recovered data implicated the criminal activity at issue in the warrant applications. Indeed, the executed searches swept in all data and communications without regard for any specific time frame. *See id.* Such general warrants are universally condemned by the Fourth Amendment. *See Garrison*, 489 U.S. at 84.

As a result, this Court should reverse the trial court's denial of Canales' motion to suppress.

## CONCLUSION

For the foregoing reasons, this court should vacate and set aside the convictions of Appellants on Counts 9, 10, 11, and 12, and the special finding as to Count 1, reverse the trial court's denial of Canales' motion to suppress, and grant such further relief as the court deems just and proper.

## REQUEST FOR ORAL ARGUMENT

Appellants each respectfully request oral argument on this appeal.

/s/ Joseph D. King
Joseph D. King
KING CAMPBELL
PORETZ & THOMAS, PLLC
118 North Alfred Street
Alexandria, Virginia 22314
(703) 683-7070
*Counsel for Appellant Sagastizado*

/s/ Lana Manitta
Lana Manitta
LAW OFFICE OF LANA MANITTA, PLLC
1800 Diagonal Road, Suite 600
PMB 1152
Alexandria, Virginia 22314
(703) 705-4428
*Counsel for Appellant Saldana*

/s/ Mark Bodner
Mark Bodner
ATTORNEY AT LAW
4041 University Drive, Suite 403
Fairfax, Virginia 22030
(703) 385-6667
*Counsel for Appellant Rivas*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No.  24-4251(L)    **Caption:** US v. AGUILERA et al.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓]    this brief or other document contains ____12,549____ [*state number of*] words

[ ]    this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓]    this brief or other document has been prepared in a proportionally spaced typeface using
       Microsoft Word 2010_____ [*identify word processing program*] in
       14 point Times New Roman_____ [*identify font size and type style*]; **or**

[ ]    this brief or other document has been prepared in a monospaced typeface using
       _____ [*identify word processing program*] in
       _____ [*identify font size and type style*].

(s) Lana Manitta_____

Party Name appellant_____

Dated: 10/21/2024_____